IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 16-cv-02366-RBJ

MICHAEL GREEN,

    Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

    Defendant.

---

ORDER AFFIRMING DENIAL OF BENEFITS

---

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. It is a review of Defendant Life Insurance Company of North America's denial of Plaintiff Michael Green's claim for long-term disability benefits. After considering the arguments, applicable law, and administrative record, the Court affirms LINA's denial of benefits for the reasons stated herein.

## BACKGROUND

### A. Facts.

Mr. Green was a truck driver employed by McLane Company, Inc. ("McClane"). In December 2014, Mr. Green began experiencing cloudy vision. Admin. Rec. at 238. He visited Dr. Kenneth Van Amerongen at Van's Eyecare on December 4th, 2014, and was diagnosed with posterior vitreous detachment ("PVD"). *Id*. PVD is generally a benign and asymptomatic

1

condition that occurs when the vitreous gel that fills the eye separates from the retina. *Id.* at 1159. Dr. Amerongen noted that there were no bleeds or tears on Mr. Green's eyes, but recommended that Mr. Green seek out a retinal specialist if his symptoms worsened or failed to improve. *Id.*

On February 25, 2015, Mr. Green sought treatment with Dr. Justin Kanoff at Eye Care Center of Northern Colorado. *Id.* at 909. Dr. Kanoff diagnosed Mr. Green with a macula-off retinal detachment of the right eye. *Id.* Mr. Green underwent three surgeries over the course of six months to treat his right eye, but he ultimately suffered permanent vision loss. *See id.* at 216-221, 425-428, 909, and ECF No. 26 at 5. This vision loss renders him unable to work as a truck driver. ECF No. 36.

McClane provided its employees with a group disability benefits plan ("the Plan"). Mr. Green was covered under Policy No. VDT-0980073. *Id.* at 7. The Plan was administered by Life Insurance Company of North America ("LINA"), and McClane appointed LINA "as the designated fiduciary for the review of claims for benefits under the Plan." Admin. Rec. at 38. This gave LINA the "authority, in its discretion, to interpret the terms of the Plan; to decide questions of eligibility for coverage or benefits under the Plan; and to make any related findings of fact." *Id.*

Under the Plan, "Disability/Disabled" is defined as follows:

> You are considered Disabled if, solely because of Injury or Sickness, you are:
>
> (1) unable to perform the material duties of your Regular Occupation; and
>
> (2) unable to earn 80% or more of your Indexed Earnings

2

from working in your Regular Occupation.

*Id*. at 21. A "Sickness" is defined as "a physical or mental illness." *Id*. at 23. The Plan promises the following:

> We will pay Disability Benefits if you become Disabled while covered under this Policy. You must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. You must provide to us, at your own expense, satisfactory proof of Disability before benefits will be paid.

*Id*. at 12. The Plan's Pre-Existing Condition limitation, which is central to this case, states:

> We will not pay for benefits for any period of Disability caused or contributed to by, or resulting from, a Pre-existing Condition. A 'Pre-existing Condition' means any Injury or Sickness for which you incurred expenses, received medical treatment, care or services including diagnostic measures, or took prescribed drugs or medicines within 3 months before your most recent effective date of insurance.
>
> The Pre-existing Condition Limitation will apply to any added benefits or increases in benefits. This limitation will not apply to a period of disability that begins after you are covered for at least 12 months after your most recent effective date of insurance, or the effective date of any added or increased benefits.

*Id.* at 15.

## B. Procedural History.

Because of his vision loss, Mr. Green was unable to perform his job as a truck driver. He applied for short-term disability ("STD") benefits with LINA on February 27, 2015. *Id*. at 43. LINA accepted Mr. Green's claim for STD benefits commencing on February 28, 2015. *Id*. at 79. Mr. Green received STD benefits for the full available period through August 21, 2015. *Id*. at 241.

3

When it became clear that Mr. Green would be unable to return to work after receiving the maximum amount of STD benefits, LINA evaluated whether Mr. Green qualified for long-term disability ("LTD") benefits. *Id*. at 170. On October 20, 2015 LINA denied Mr. Green's claim for LTD benefits. *Id*. at 476. LINA's denial of benefits was based on the following:

> You were treated with Dr. Amerogen [sic] at Van's Eyecare on December 4, 2014 reporting cloudy and foggy vision. Dr. Amerogen diagnosed you with PVD (Posterior Ventrous [sic] Detachment).
>
> The information outlined above falls within the pre-existing time frame and is related to your current disability, and therefore your claim has been denied. Because we determined you are limited from coverage for this condition, we did not continue our evaluation of your disability. At this time, your claim has been closed and no benefits are payable.

*Id.*

On February 4, 2016 Mr. Green submitted an administrative appeal to LINA. He produced medical documentation from Dr. Kanoff noting that retinal detachment—not PVD—was the cause of his vision loss. On March 3, 2016 LINA denied Mr. Green's appeal, stating:

> Based on the review of all medical information reviewed, it was determined by [Dr. Sami Kamjoo, LINA-hired independent peer reviewer,] that Mr. Green's visual loss was due to the macula-off retinal detachment which he was diagnosed with on February 25, 2015. The posterior vitreous detachment that he developed on December 4, 2014, was highly likely to have caused a retinal tear and was the initial event that led to a retinal tear which subsequently led to the development of the retinal detachment and vision loss.
>
> Based on the above, it was determined that the information outlined falls within the pre-existing time frame and the decision to deny Mr. Green [sic] claim has been affirmed. Since it was determined Mr. Green was limited from coverage for this condition, we did not continue our evaluation of Mr. Green's disability. At this time, Mr. Green's

claim will remain closed and no benefits are payable.

*Id*. at 1101-02.

On May 20, 2016 Mr. Green requested a second appeal in accordance with his rights under ERISA. *Id*. at 1110. Mr. Green provided LINA with a report authored by Dr. Ronald Wise. *Id.* at 1111-12. Dr. Wise found that PVD "was not the cause of Mr. Green's vision loss in his right eye, but rather an event prior to presumably the retinal tear, which to a reasonable degree of medical probability led to the rhegmatogenous retinal detachment." *Id.* at 1112. Further, Dr. Wise noted that PVD is not "listed as a risk factor for rhegmatogenous retinal detachments in the [American Academy of Ophthalmology] literature reviewed." *Id.* In addition to Dr. Wise's report, Mr. Green provided LINA with another letter from Dr. Kanoff that stated: "I read the previous denial letter, and I have to strongly disagree with its conclusions . . . posterior vitreous detachment was not the cause of his vision loss; the retinal detachment was the cause of the patient's vision loss." *Id.* at 1138. LINA denied Mr. Green's second appeal as well, holding:

> [Dr. George Yanik, LINA-hired independent peer reviewer,] opined the macula-off retinal detachment diagnosed on February 25, 2015 was caused or contributed to by the posterior vitreous detachment diagnosed on December 4, 2014. Retinal detachments frequently begin with a posterior vitreous detachment which allows the vitreous gel to separate from the retina causing a retinal tear. This tear allows vitreous fluid to enter causing an eventual detachment of the retina.
>
> The information outlined above falls within the pre-existing time frame, and therefore your client's claim has been denied. Because we determined he was limited from coverage for this condition, we did not continue our evaluation of his disability. At this time, your client's claim has been closed and no benefits are payable.

*Id.* at 1159. Mr. Green subsequently appealed to this Court.

5

**STANDARD OF REVIEW**

When a plan administrator empowers an insurer to make determinations regarding whether a claim for benefits will be accepted, a court reviews the determination for an abuse of discretion. *Murphy v. Deloitte & Touche Group Ins.*, 619 F.3d 1151, 1157 (10th Cir. 2010). Under this standard, the court considers whether the denial of a claim for benefits was arbitrary and capricious. *Id.* Under the arbitrary and capricious standard, the court considers whether the administrator's decision was reasonable and made in good faith. *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004). An administrator's decision is reasonable if the administrator based the decision on substantial evidence in the administrative record before it. *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992) (noting that substantial evidence is "more than a scintilla but less than a preponderance" of evidence).

Because ERISA relies on trust law principles, several factors must be considered in reviewing an insurer's denial of benefits. While no one factor is dispositive, "any one factor will act a 'tiebreaker' when the other factors are closely balanced . . . ." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 106 (2008). These factors include any procedural irregularities, such as where the insurer "cherry picked" the file for evidence to support a denial. *Smith v. Reliance Standard Ins. Co.*, 322 F.Supp.2d 1168, 1177 (D. Colo. 2004). In cases like this one, where LINA both funds the Plan and adjudicates benefits claims, courts should weigh the potential conflict of interest "as a factor in determining if there is an abuse of discretion." *Glenn*, 554 U.S. at 114.

A plan administrator is required to provide a claimant with the specific reason for a

denial of benefits. 29 U.S.C. § 1133. Courts "consider only the rationale asserted by the plan administrator in the administrative record and determine whether the decision, based on the asserted rationale, was arbitrary and capricious." *Spradley v. Owens-Illinois Hourly Employees Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012).

## ANALYSIS

Mr. Green argues that LINA's determination that PVD is a pre-existing condition precluding disability benefits was arbitrary and capricious. I disagree. The pre-existing condition limitation provision in the Plan guides this Court's review. Admin. Rec. at 15. First, the provision states that LINA "will not pay for benefits for any period of Disability caused or contributed to by, or resulting from, a Pre-existing Condition." *Id.* The provision then defines a pre-existing condition as an injury or sickness for which a claimant "incurred expenses, received medical treatment, care or services including diagnostic measures" within 3 months before a claimant's most recent effective date of insurance. *Id.*

With this language in mind, the Court's review boils down to the two following questions: (1) Did the LINA administrator have substantial evidence that Mr. Green's PVD caused, contributed to, or resulted in his disabling vision loss?; and (2) Did the LINA administrator have substantial evidence that Mr. Green received treatment, including diagnostic measures, within three months of his most recent effective date under the Plan? Because I find that the answer to both questions is "yes," I affirm LINA's denial of Mr. Green's LTD benefits.

### 1. Pre-Existing Condition.

As a preliminary matter, this Court finds no evidence that the administrator's decision was the product of bias. *See Glenn*, 554 U.S. at 114. While I am mindful of the conflict of interest

present due to LINA's role as both claim administrator and funder of benefits, I find no evidence that the administrator's decision in this case was unreasonable or made in bad faith. *Id.*

I do take note of the comments in plaintiff's opening brief about the three questions LINA posed to Dr. Yanik. ECF No. 26 at 10-11. In his brief counsel asserts that LINA, "unsatisfied" with the answers to the first and second questions, "persisted in seeking the answer it wanted by returning to the question a third time," until "Dr. Yanik finally provided the response LINA was seeking." ECF No. 26 at 10-11. In fact, LINA didn't return to the same question at all, let alone three times. Each question was different, and neither the questions nor the answers suggest bias. The first question was whether Mr. Green incurred medical expenses or received medical treatment between October 1, 2014 and December 31, 2014 for the same condition noted on February 15, 2015. The obvious answer (and Dr. Yanik's answer) was "no." No one suggests that Mr. Green sustained a macula-off retinal tear during the October-December 2014 period. The second question was whether the medical expenses or treatment Mr. Green received during the October-December period caused or contributed to his macula-off retinal tear. Again, the obvious answer (and Dr. Yanik's answer) was "no." No one suggests that the care Mr. Green received for the PVD caused the macula-off retinal tear. The third question was the relevant question – did the PVD cause or contribute to the macula-off retinal detachment that was diagnosed on February 25, 2015. Dr. Yanik's answer to that question was "yes." This series of questions and answers does not in any way support the negative inferences that counsel asks the Court to draw.

At the heart of the parties' dispute is whether PVD caused, contributed to, or resulted in Mr. Green's vision loss. Mr. Green argues that the administrator's finding that PVD was a pre-

existing condition is unreasonable based upon a theory of attenuation. ECF No. 26 at 2. Mr. Green argues that although PVD may have been the first link in a chain of events that lead to his vision loss, PVD was too far removed from the resulting disability to be properly classified as a pre-existing condition. *Id.* In response, LINA argues that the administrator's decision was reasonable because the substantial body of evidence supports a finding that PVD contributed to or resulted in Mr. Green's vision loss. ECF No. 27 at 12. In LINA's view, one cannot divorce PVD, the likely cause of the retinal detachment, from the vision loss caused by the retinal detachment. *Id.* Therefore, LINA argues that the administrator was reasonable in determining that the nexus between PVD and the resulting disability was sufficiently close to classify PVD as a pre-existing condition. *Id.*

This Court is tasked solely with determining whether the administrator's decision is reasonable, meaning that it is supported by substantial evidence in the administrative record. *Sandoval*, 967 F.2d 377 at 381. In denying Mr. Green's LTD benefits claim, the administrator held that Mr. Green's disabling vision loss was caused by the retinal detachment, and this retinal detachment was the result of PVD. Admin. Rec. at 1159. Therefore, the administrator held that PVD was a pre-existing condition to the vision loss. *Id.* The administrator based this decision on the medical opinions of Dr. Kamjoo and Dr. Yanik. These independent, board-certified ophthalmologists were hired by LINA to provide peer reviews of Mr. Green's case. *Id.* at 1126, 1159. Both Dr. Kamjoo and Dr. Yanik opined that Mr. Green's PVD lead to the retinal detachment which caused Mr. Green's disabling vision loss. *Id.* Dr. Kamjoo opined that PVD "was the initial event that led to a retinal tear which subsequently led to the development of the retinal detachment and vision loss." *Id.* at 1101-02. Dr. Yanik opined that "[r]etinal

9

detachments frequently begin with a posterior vitreous detachment (PVD) which allows the vitreous gel to separate from the retina causing a retinal tear. This tear allows vitreous fluid to enter causing an eventual detachment of the retina." *Id.* at 1159. Finally, the record shows that Mr. Green's own doctors—Dr. Amerongen, Dr. Kanuff, and Dr. Wise—agreed with Dr. Kamjoo and Dr. Yanik that PVD was the likely cause of Mr. Green's retinal detachment. *Id.* at 1097.

Mr. Green presented the administrator with medical evidence to counterpoise Dr. Kamjoo and Dr. Yanik's opinions. First, Mr. Green submitted a medical report authored by Dr. Wise stating that PVD was not the cause of Mr. Green's vision loss, but "rather an event prior to presumably the development of a retinal tear, which to a reasonable degree of medical probability lead to the rhegmatogenous retinal detachment." *Id.* at 1112. Further, Mr. Green submitted a letter from Dr. Kanoff that noted "the posterior vitreous detachment was not the cause of his vision loss; the retinal detachment was the cause of the patient's vision loss." *Id.* at 909.

Thus, in viewing the administrative record, this Court notes that the administrator was presented with medical opinion evidence from five doctors who unanimously agreed that PVD likely led to the retinal detachment, which was the cause of the ultimate injury. *See id.* at 1101-02, 1112, 1138, and 1159. Although Dr. Kanoff and Dr. Wise differed slightly from the other doctors in the sense that they emphasized that PVD was not the *direct cause* of Mr. Green's vision loss (which no one disputes), they all acknowledged the highly probable link between PVD and the ultimate injury. *See id.*

Under Tenth Circuit law, a pre-existing condition "cannot merely [] be one in a series of factors that contributes to the disabling condition; the disabling condition must be substantially

10

or directly attributable to the pre-existing condition." *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004). The facts of *Fought* illustrate the boundaries of this principle well. In *Fought*, the plaintiff underwent heart surgery to treat her pre-existing heart disease. *Id.* at 999. After the surgical procedure, a staph infection developed in the surgical wound and caused the plaintiff to become disabled. *Id.* at 1000. When she sought disability benefits under her insurance plan, the claim administrator denied the plaintiff's disability claim because "the staph infection was the result of coronary bypass surgery, which was performed to treat her pre-existing heart-condition." *Id*. The Tenth Circuit rejected the administrator's determination because the causation analysis was too attenuated. The Court noted that "[t]here were at least five intervening stages" between the reason she needed surgery—heart disease—and the ensuing staph infection. *Id*. at 1010. Therefore, the Court held that heart disease could not be classified as a pre-existing condition to her disabling staph infection. *Id.*

Here, the administrator's determination that Mr. Green's vision loss was "substantially or directly attributable" to PVD is reasonable. *Id*. The administrator was presented with medical evidence charting the likely sequence of events leading to Mr. Green's vision loss: (1) PVD allowed vitreous gel to separate from Mr. Green's retina which caused a tear, and (2) this tear allowed fluid to enter, causing Mr. Green's retina to detach. Admin Rec. at 1138 (Dr. Yanik's description of causation). There is no suggestion in the record that there were "five intervening stages" between PVD and Mr. Green's vision loss, or even two intervening stages for that matter. *See Fought* at 1010. Every doctor in the record agreed that PVD was a culprit. On the basis of these opinions, the administrator was justified in determining that Mr. Green's vision loss was

11

"substantially attributable" to PVD. *See Fought* at 103. Therefore, the administrator's determination that PVD was a pre-existing condition was neither arbitrary nor capricious.

## 2. **Diagnosed During "Look-Back Period."**

Because I find reasonable the administrator's determination that PVD constituted a pre-existing condition, the Court now turns to the Plan's second pre-existing condition limitation. This condition is met if the claimant received treatment for the pre-existing condition within three months of their most recent effective date under the Plan (the "Look-Back Period"). Notably, treatment includes "diagnostic measures" under the terms of the Plan. Admin. Rec. at 15. Under the substantial evidence standard, I find that the administrator's determination that this condition is met is reasonable.

Mr. Green's relevant effective date of coverage under the Plan was January 1, 2015. *Id.* at 408-09. Therefore, the three month Look-Back Period was from October 1, 2014 to December 31, 2015. *Id.* On December 4, 2014 Mr. Green saw Dr. Amerongen with complaints of foggy vision. *Id.* at 909. Dr. Amerongen evaluated Mr. Green and diagnosed him with PVD. *Id.* Because the evidence in the record shows that this visit was within the Look-Back Period and involved "medical services including diagnostic measures," the administrator's determination that this condition was met is supported by substantial evidence.

## ORDER

Because this Court finds that LINA's decision was based on substantial evidence, and therefore was neither arbitrary nor capricious, I AFFIRM the administrator's denial of Mr. Green's long-term disability benefits.

DATED this 29th day of September, 2017.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge